Case is number 13-1030, TFH Publications versus Dusk Coast Sale Manufacturer. Mr. Bernstein. Thank you. Good morning, Your Honors. We asked you to be prepared to address the Jang case. Yes. Do you understand the problem with the stipulated order here based on that? Yes, I do. And I've looked at the Jang case, the case that came out of this court in 2008, and the cases cited therein. And my understanding of the Jang case is the court had discomfort with the then stipulation for two reasons. One is that the court could not determine from the stipulation which of the disputed claim terms or which of the claim terms on appeal would affect infringement. And the second issue that the court raised was that to the extent that claim terms did affect infringement, it couldn't tell to what extent or that the context was not sufficient to be able to look at the claim terms and relate them to the infringement, to the accused process. Similarly here, I think that the stipulation doesn't adequately address those same two issues. I think the second issue is the more problematic one than the first issue. And I say that for two reasons. With respect to the first issue, if you look at the joint submission, the supplemental joint submission that the parties submitted, which begins in JA-62, and in particular look at JA-66, Section C, pursuant to the local patent rules in New Jersey, we did identify three claim terms that were, quote, and that is vented barrel extruder and injection molding and cooling. Do you lose if we agree with the district court's construction of vented barrel extruder? Yes, I do. Even if you prevail with respect to the claim construction on the other construction issues? Yes, vented barrel extruder is in every independent claim. So if you agree with the district court, then I cannot prove infringement, which is the essential reason why we entered into the stipulation. I do think that it's not the only claim term that affects infringement. It is, of course, a significant one, which is why we characterized it that way for the district court. You argued before the PTO that extruders should be replaced with vented barrel extruders. Correct. If you didn't mean for the extruder to be vented, what did you mean before the PTO? Well, what my client said before the PTO, what we've said to the district court, is that the essential purpose of this invention is for the venting. In other words, to remove moisture from the beginning of the process, all throughout the process, until the end of the process. Why didn't you just say open-ended or some such? That is, it can come out the front, it can come out the back. As long as it vents, it's a vented barrel extruder. Well, there's two issues which have at times been conflated or confused, if you will. The patent, the essential invention of the patent is there has to be venting in order to remove the moisture throughout the process, both in the extrusion process and in the injection molding process. But just limit it now to the extrusion process. Then any extruder has an opening at some place, right? Because it's an extruder. Correct, but that doesn't mean it does venting. For example, if I were to utilize this pen to demonstrate an extruder, and let's say that the feed hopper, where the material comes in, is right at the end of this blue tip here, you could have the exit point here, you could have the exit point back here, you could have it in both places. You could have the exit point as also part of the feed throat. Now, there are certainly possibilities whereby you don't have an exit point, in which case you're not venting at all. The moisture stays within the body of the material and it doesn't vent. Here, however, my client's invention is that the moisture vents through the barrel of the extruder, in part because it's starved-fed, not flood-fed, and it exits at a certain point. The district court placed an unfair and unreasonable limitation, an impermissible limitation by saying it has to vent here, as opposed to here or here or in combination. If I understand correctly, what the district court said was that where the material is extruded, the exit point can't serve as the vent, right? Well, the district court said two things, because we actually had venting at three different points on this extruder. And bear in mind, it's also interesting, at least, to say that this is a vented-barrel extruder. It's just that the vent ports along the barrel were plugged on the date of the inspection. But it was still venting inside the barrel, and the exit points of that vented material were threefold. One at the die, one at the feed hopper throat, because it functioned as both a feed throat as well as an exit point. And then there was two misaligned pieces of metal, which allowed some steam to escape as well. But the point of the matter is, and this is what the ordinary skilled in the art witness who testified, the only one, said that you could have a combination vent port and feed throat. And that's one of the points at which the material vented from the extruder being used by the defendant. Now, the problem that we... You're talking about what their device looks like, but that's not part of the stipulation. The stipulation is if we adopt the district court's construction, you lose. Correct, and that then gets into the second part of the Jang case, where this court essentially said that we can't decide these issues without a better factual context. And one of the factual contexts that should be developed below to create a better record for this court is what extruder was being used to show that it's still a vented barrel extruder. They just changed the exit points of the vented material. From my client's point of view, at least, from our position before the district court and this court, there is no dispute that the material is venting. There is venting going on in this extruder. The question that the court grappled with is where was it exiting and why that makes a difference. And we say it doesn't make a difference. It's still venting and it's still exiting at some point, either at the feed throat before or after the feed throat. It doesn't make a difference where. And there's nothing in the specification. There's nothing in the patent. There's nothing in the extrinsic evidence, and there's nothing from the testimony of those skilled in the art which says that it makes a difference where the vented material actually exits from the vented barrel extruder. But that was the issue that the district court squarely confronted and ruled against you on, right? Absolutely, and that's why. It seems to me that when you say, well, we have to have the district court flesh out the facts, you agreed that under the construction that the district court adopted, and you've walked us through the elements of that construction, in effect, you lose. So if we decide, it seems to me it's just a binary question. Either the district court was right or the district court was wrong, and I'm not sure at this point what supplementation is necessary in order to decide that question, particularly in light of your stipulation that the case was ripe, in effect, for appeal based on the plaintiff structure. Well, when this court issued the directive to address the Jang case, my preliminary assessment, if you would, is that this court's preliminary conclusion was that you really needed more factual context, and that's what I was trying to address. I think this court can decide vented barrel extruder, although I think you'd be in a better position with a more complete record as to what is actually being used below by the defendant and how all it did was just manipulate the machine to change the exit point, which therefore supports my client's position that the exit point is irrelevant. You can modify, jury rig any kind of machine or any kind of extruder to change the exit point, but that doesn't change the fact that there's venting inside the barrel, and that's the point of my client's invention is to create venting within the barrel to remove moisture so you get from your high of 40% moisture at the outset to your low of 20% by the time you're done with both the extrusion and injection molding processes. So the point is, and this is what, with all due respect to the trial judge, she didn't understand this or at least didn't agree with it, the exit point is irrelevant. There's venting, and that's the essential purpose of this invention, to remove moisture from the product throughout the process, and the district court didn't appreciate that. I looked at the Jang case in this court's directive and concluded that it would certainly help this court with a better factual record, but if you disagree with me that the exit point is irrelevant, in other words, if you think the exit point is relevant, and that's the essential invention, as much as I respectfully and wholeheartedly disagree with you, I would lose this case, and you probably don't need a great deal of additional supplementation of the record, but I still think it would help you. If I could, since you're focused on the vent-to-barrel extruder, remember there was... Let me see if I can be clear about this. I understand the district court's plain construction. It says there has to be an opening on the barrel to let moisture escape, which is different from the exit point for the extruded material. Is that your understanding? Partially. The district court judge said that you had to have the exit point along the barrel and rejected my argument that the exit point could also be the feed throat, which is really no different than what Your Honor just said. It's just, again, placement. You were looking at the exit. So it either has to be the front end or the back end. The district court said front end and back end isn't good enough. There's got to be something in the middle, for lack of a better term. Yes, the district court said it has to be the middle. Right. We said no, it could be at the... Either the front or the back or both. That's your position. Or we're all three. Right. And moreover, when you have the feed throat, normally you have some vacuum assist, which is discussed in the patent, to make it easier to remove it through the feed throat as well. If you look at... We're talking about, just to revise what I characterized as the district court's claim instruction, there's an input where you put the material into the barrel, the exit point at which the material is extruded, and the district court said the venting has to be through some other opening. Well, the district court said the exit of the vented material. The venting occurs within the barrel itself, in part because the screw doesn't meet the interior edges of the barrel, and in part because there's star feeding. So there's room for the water to essentially evaporate, moisturize, and then move whichever way it needs to go in order to actually exit. I'm not understanding what you're saying. What was wrong with what I said? In other words, when you're doing this extrusion process, you're putting material into the barrel through one opening, it's exiting, extruding through another opening. And the district court says that can't be the venting, right? That is correct. There has to be some other opening to let the moisture escape. Right, but the venting occurs. Well, I think you're using the term venting, perhaps, in a very technical way. Let's equate, for present purposes, venting and escaping, or exiting. Now, I think with those two terms being used interchangeably, then you would agree with the way Judge Guy characterized the difference between your position and the district court's, would you not? Yes, although I disagree with the district court's combining those terms or substituting them for each other. Oh, okay. Because in my view, there's venting, and then there's the exit point, which is what you're referring to. Okay, all right. Again, and I think it's critical, it bears repeating, the essential invention of this patent is the removal of water from the extradate, from the material itself. And you do that within the barrel, and then it becomes, well, where does that gaseous material, the volatiles, exit? And our view is it doesn't matter whether it exits here, here, here, or a combination, because it needs to exit. If it doesn't exit, then it's not being vented at all, and it remains in the material. And that's the essential invention of this patent. I see I only have a couple of minutes left. I'd like to try to reserve that for Robach. Okay. Thank you. Mr. Tampkin. Honorable Court, good morning. I'll start as well with the Jane case, because that's what the Court would like us to be sure we address. The Jane case does require that there be either an understanding in the stipulation as to what the issue of infringement is, or alternatively, such that the Court can ascertain that. The Jane case at page 1334 and 1335 makes it clear that if the Court can ascertain the basis of the challenge judgment, the Court can exercise jurisdiction. Likewise, there are some cases cited in the Jane case that the Court knows as to where, if the Court could infer from the record the basis for infringement, then the Court should move forward with an opinion and not send it back down. I do not think this case should be sent back down. It doesn't accomplish any purpose. There's two issues in this case. One is the vented barrel extruder issue. It's very clear there is no dispute. There's ample evidence in the record of exactly what the situation is there. There is a barrel that did not have a third opening, if you will. You spoke with my opposing counsel about what the construction is. The construction really relates to having an opening in the barrel other than the entry and the exit. There is no third opening such that gaseous material could escape. The venting is very clear that whatever the material, whatever the extruder down below would have been, whatever the evidence would have been, it was an extruder that did not have a third hole, simply put. On the injection molding and cooling, that's also a binary issue. The only reason we're here is because the Court's construction required that the invention be something cooling in the injection molding as the first zone. The only reason we're here, and the Court can infer that, is that cooling did not take place. If the cooling took place, then there wouldn't be an issue. But the cooling does not take place. I think the Court can infer that. So because of that, there's no reason to send this back down. How do you infer that? You infer that because this is an issue in dispute. The only reason that we are here on this question, and the only reason there was a stipulation on these points, was because the plaintiff in the case, T.F.H. Publications, could not prevail on infringement. But the plaintiff, I take it, I think you're going to give the answer yes to this because you're a punitive, and you have an even greater reason to. But I take it that your position is that you need win on only one of those two issues, and in particular, the vented barrel extruder. If you win on that, the case is over. Correct. If we win on the vented barrel extruder, it's in every claim, and the plaintiff has conceded. And that was the basis for the stipulation, one of the bases for the stipulation. But if you lose on that, and then we move to the cooler, cooling, and if you win on that, also case over, I take it. Correct. Every claim, every independent claim requires that. And so the question is, this is a case between two competitors, been dragged out for several years, a 2008 case. What's the benefit of sending it back down? And I don't think there is one. These are two binary issues. There's not a question as to what could be the issue. They're really binaries. Either it cools in the first zone, or it doesn't. And so because of that, I think this court can decide the issue, should decide the issues. I do recognize that I can give you a whole series of sites on the vented issue because the vented issue is much more complex, if you will, much more developed. But you can look at all throughout the joint appendix, where Dr. Malloy, the expert, actually provides all sorts of information. And in fact, there's a footnote in the appellant's brief, footnote four, that actually references that there are no openings, that the vent ports are, in fact, welded shut. So let me move on to the substance, if you will. And what is important is, and I think the opposing counsel referenced, that the essential component of the invention is this reduction of moisture. And that may be, but it's important to understand that that essential component is there either way, whether it says vented barrel extruder or not. The claim term itself talks about introducing and heating said mixture, and this is in a vented extruder, to form extruded beads. And this is important. We're in the water content of said beads upon discharge from said extruder is less than the water content of said mixture entering the extruder. In other words, that language there, after the vented barrel extruder language, says the water content is reduced. So therefore, what's the purpose of the vented barrel extruder? It was a narrowing amendment. It was a narrowing amendment to say the way the water content is reduced, which is already there, is this vented barrel extruder. And so it's not merely venting. The concept of venting, of letting gas escape, was there. And the way it was done was a vented barrel extruder. And I want to also direct the Court to the specification on this issue. Well, I guess really the difference between your positions perhaps could be characterized, and I think you're going to say this when we get to the specification, but correct me if this is an unfair characterization. Your argument is that the term vented is used in a structural way and his is that it's being used in a functional way. That is to say that in your view, to be a vented barrel extruder, it has to be a barrel with a vent other than the openings at each end. His position is as long as it performs the function of venting, i.e. through star feeding or whatever mechanism is used, then it is a vented barrel extruder as that term is used in the patent. Is that a fair characterization of the difference between your two positions? Absolutely. That is a fair characterization. But it's important to understand why that the characterization that we have been articulating and the District Court adopted is correct. Because the PTO allowed it based on it. That is an additional reason I wasn't going to suggest, but yes, it's wrong. But in the specification, there's a language that everybody quotes that says, finally in the context of the present invention where the water level charged in the extruder is preferably lower during the course of extrusion, a vented barrel extruder is employed, wherein such venting lowers the water level to a desired level. It actually says that if you look at that language, you don't need the word a vented barrel extruder is employed. Again, just like the claims. It says where in this invention we are reducing water, we vent. We use the process of venting. And here it says, and you use a vented barrel extruder. And so what it's saying is a vented barrel extruder is a specific thing and when the venters wanted to talk about venting, they did so. Now, importantly, the following sentence is something that really has not been briefed very much. And it says, to facilitate such water level change, it has been found particularly useful to apply a light vacuum to the extruder barrel at the vent port. In other words, the vent port. In other words, the patent specification is recognizing that vented barrel extruders have vent ports. That's very important. That is what the district court found, which is the term vented actually modifies, is an adjective, not an adverb. It's an adjective that modifies the barrel. It's a vented barrel. It means it has another hole in it. Importantly, this goes to where, to Juzwal's point on what the PTO did. The PTO allowed the patent when the vented barrel extruder term was added. What everybody recognizes, I think even the opposing counsel recognized that that term was a limitation. It narrowed the claim. It went from any extruder to a vented barrel extruder, a specific type of extruder. So we looked at the intrinsic evidence. Sure, because under your opposing counsel's argument, every extruder is vented. Correct. Every extruder is vented because every extruder can be starved. So the PTO didn't have to make any change at all. They could have just allowed it the first time. The PTO could have allowed it the first time under that construction, but that's not what happened. In fact, there was a rejection. The rejection was based on the Witwer reference. The Witwer reference actually was a process where it was a non-vented extruder. If you look at the pictures, if you look at the figures, it's a non-vented extruder. There's no reference, no discussion whatsoever in Witwer to venting. And the patentee or the applicants amended their claim to add the term vented barrel extruder. Now, what's important about that is opposing counsel argues that, well, the way that really Witwer was traversed was due to the fact that this was a two-step process as opposed to a one-step process, and that's what's in the reply brief. That's not accurate because the process was always a two-step process. There was no change in the process between the pre-amended claims and post-amended claims. So, originally, if one looks at Joint Amendment J195, one can look at Amendment A, and Amendment A does not add the different B-step and C-step. The B-step and the C-step were already there. B-step is the extruding to make the beads, and the C-step is the injection molding of the beads to make a dog chew. So, it was always a two-step process. What was added? What was added was the vented barrel language. The vented barrel language was the change that got around Witwer. So, that must be narrowing, and if it already was reducing moisture, and it already had the two-step process, then the only logical conclusion is the vented barrel is structural. Bryson re-characterized the distinction. The vented barrel has to be a structural element. So, with that, I will make one other point, which is that one of the arguments that's made is that if you, on this vented barrel issue, if you just allow venting, that process is enough. That creates perverse results, particularly because any extruder can be star fed. Any extruder, therefore, becomes a vented barrel extruder. The actual converse also is true under this argument, which is imagine an extruder that has vent ports. If there is absolutely no venting because dry material goes there, that extruder with vent ports is not a vented barrel extruder. In fact, to the extent the court is interested in looking at the expert testimony, the expert on page JA 351 through 352 actually says this, which is if you put a dry material in a vented extruder, a dry material in a vented barrel extruder, it's not a vented barrel extruder because there is no venting. That doesn't make any sense here, and that's why the district court rejected the expert testimony. I think what's here, and we haven't heard here on this expert testimony point, is why we should even be listening to an expert in this case. The only time the court has found that it's appropriate to listen to expert testimony post Phillips is when there's an ambiguity. Here, there's no ambiguity created by the intrinsic evidence. You don't have some of the intrinsic evidence arguing one way, some of the intrinsic evidence arguing the other way. What you have is the intrinsic evidence saying a vented barrel extruder is a barrel with vents, and then you have an expert coming along saying, I think I can interpret it to be, well, it just means venting. If that's the path we go down, every case you can get an expert to talk about this. That's what the Phillips case actually says. The Phillips case warns against getting experts because expert testimony is not contemporaneous and experts may say things that are out of context. Importantly, the court rejected that because the court actually looked at the sites, the materials, the extrinsic evidence that the expert relied upon, and all of that extrinsic evidence actually showed vent ports. The expert was saying that there's a vent port here. There can be a vent port behind the feed throat. There can be a vent port kind of using the feed throat as a partial space where a separate vent port can be put. Keep in mind, the reason the vent port has to be separate than the feed throat is it's a port where you can apply a vacuum and gaseous material can escape. You can't do that if it's right in the feed port. So it's separate and apart from the feed port, and that's why the court rejected it, and that's why this court should reject the expert testimony. I'll turn in my remaining time just to the injection molding and cooling. This is quite a simple and straightforward argument. There are three places where the patent makes clear that the invention here is the special cooling mechanism. They're all in the spec. They're absolutely all in the spec. Your argument really is that this is a disinvention type case. It is a little bit. There's two other points I have on that, very briefly. The first one is in the field of the invention section, sort of unusual section, but the very beginning, it does talk about the fact that the processing conditions, including barrel temperature and cooling profiles, are uniquely adjusted along with the other things. So there is that reference. What I did, in a way, I found that honestly, and that's at lines 10 through 15 of the patent, column one. I went and looked at every reference there was to cooling in the patent, and the only reference, the only discussion whatsoever of cooling, and to get some understanding of what's going on in the claim, is that one place in the spec. That place in the field of invention talks about unique cooling profiles. It doesn't use the magic words disinvention, but it does talk about that. But importantly, there's a whole long discussion of this uniqueness, and importantly, not only is it unique, it is contrary to the way things are ordinarily done, and that's very important. This is a distinction because it is contrary to the way things are done. The uniqueness of the invention is it's differentiating from everything else, and so because of that, the district court found that passage is very clearly an overall limitation, and then it gets more. In that passage, the specific embodiments, there's one where it's under 150 degrees Fahrenheit. There's another zone where it would be under 75 degrees Fahrenheit, etc. So I think that's very clear, and ultimately, Your Honors, I think the district court got it right, and the court should be affirmed. I'm out of time, unless the court has any questions. Thank you. Thank you. Your Honors, let me start with the event about extruder, the issue of the third opening. Essentially, what my colleague is arguing is that there is disclaimer, that there was a disclaimer as a result of the prosecution history. In order for there to be a finding of a disclaimer, it has to be clear and convincing. It has to be clear and convincing to, or unmistakable to, one of ordinary school in the art, and the only person… It has to be a disclaimer. I mean, the prosecution history can help us interpret the term. Correct, but in order to find, though, that there's been a disclaimer, the Omega case and the LBEX case that we cited says that it has to be clear and unmistakable to one of ordinary school in the art. Yeah, but as Judge Sykes says, it is important, I think, to distinguish between a case in which the language of the claim, let's say, is clearly broad, and in the prosecution history, the applicant comes in and says, no, no, I don't mean it to be the ordinary broad meaning. I mean it to be something very specific. That kind of disclaimer does require specificity and clarity. Here, this seems to me to fall more on the definitional side of the line where that rule doesn't apply. In other words, if I'm asking a question as to what does a particular term mean, then I can look at the prosecution history and say, well, that's the way the parties and the applicant used that term. That is a much lower standard, it seems to me. Yeah, I understand that, but the point I'm making is this, though, that the district court had the opportunity to hear from only one person of ordinary skill in the art because the defendant's purported person of ordinary skill in the art was rejected by the court, and the only person that testified and the only, if you will, treatise that was referenced by both sides, and that's to Mr. Rowandow, both said, either in testimony or in text, that you can have an exit point at the feed throat. In fact, if you look at JA 517, that's from Mr. Rowandow's book and was testified to by my expert, Dr. Malloy, and you can have a vented barrel extruder that has the exit point for the vented material at the feed throat, especially if you have some vacuum assist, which is a preferred embodiment, of course. You can… What was the JA page again? JA 517. It's in the second shorter part of the appendix. Now, I've heard this reference by my colleague as well as in the briefing that our interpretation means that every extruder is a vented barrel extruder. Well, first of all, that's speculation by counsel because there is no one of ordinary skill in the art that testified to that, and in fact, the only person of ordinary skill in the art testified to the contrary and made it very clear that you can have this so-called third exit as part of the feed throat. And more importantly, that argument that every extruder could be a vented barrel extruder divorces itself from the essential invention of the machine, which is to provide venting, and where it actually exits is irrelevant, as I explained with my little diagram of my pen here. Okay. Mr. Bernstein, I think we're out of time. Thank you very much. Okay. Thank you, Your Honor. Thank both counsel. The case is submitted.